# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs May 13, 2014

## STATE OF TENNESSEE v. JONATHAN ALAJEMBA

**Appeal from the Circuit Court for Rutherford County**
**Nos. F-63339A, F-67470      David Bragg, Judge**

---

**No. M2013-00968-CCA-R3-CD - Filed November 12, 2014**

---

The defendant, Jonathan Alajemba, appeals his Rutherford County Circuit Court jury convictions of felony murder, second degree murder, attempted first degree murder, attempted voluntary manslaughter, aggravated assault, reckless aggravated assault, aggravated burglary, attempted especially aggravated robbery, and facilitation of conspiracy to commit especially aggravated robbery, claiming a violation of his right to a speedy trial; that the trial court erred by denying his motion to suppress the statement he made to police and his motion for transcription of witness statements; that the trial court erred by declaring a witness unavailable for the purpose of admitting prior testimony; that the evidence was insufficient to support his convictions of first degree felony murder, facilitation of conspiracy to commit especially aggravated robbery, attempted especially aggravated robbery, and aggravated burglary; that the trial court made several erroneous evidentiary rulings; and that the State committed prosecutorial misconduct during closing argument. Because the evidence was insufficient to support the convictions of aggravated burglary and felony murder in the perpetration of or attempt to perpetrate a burglary, those convictions are reversed, and the charges are dismissed. The felony murder convictions predicated upon robbery and theft remain unaffected. The trial court's judgments are affirmed in all other respects.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed in Part; Reversed and Dismissed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

L. Gilbert Anglin, Murfreesboro, Tennessee, for the appellant, Jonathan Alajemba.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Trevor Lynch and Shawn

Puckett, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On December 9, 2008, the defendant fatally shot Tommy Moss and wounded Kaitlynn Kennedy. Through the aid of accomplices, he wounded David Tompson and Jeff Fogle during a failed attempt to steal drugs from Mr. Moss at Mr. Moss's residence. The Rutherford County grand jury charged the defendant, along with Bobby Joel Wilson,[1] with 17 offenses. Disposition of the charges resulted from two separate trials, occasioned by mistrials on some of the charges at the conclusion of the first trial. At the conclusion of the second trial, the trial court imposed seven total convictions occasioned by merger of several different guilty verdicts. In order to enhance understanding of the resulting complexity of the charges and convictions, the court offers the following chart:

| COUNT | CHARGE (VICTIM) | FIRST TRIAL RESULT | SECOND TRIAL RESULT | CONVICTION (VICTIM) |
|---|---|---|---|---|
| 1 | Conspiracy To Commit Especially Aggravated Robbery | Guilty of Lesser Included Offense | | Facilitation of Conspiracy to Commit Especially Aggravated Robbery |
| 2 | Attempted Especially Aggravated Robbery (Moss) | Guilty | | Attempted Especially Aggravated Robbery (Moss) |
| 3 | First Degree Premeditated Murder (Moss) | Not Guilty; Unable to Reach Verdict on Lesser Included Offense of Second Degree Murder | Guilty | Second Degree Murder (Moss) |
| 4 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Murder (Moss) | Not Guilty | | |
| 5 | Attempted First Degree Murder (Kennedy) | Guilty | | Attempted First Degree Murder (Kennedy) |
| 6 | Attempted First Degree Murder (Tompson) | Guilty of Lesser Included Offense | | Attempted Voluntary Manslaughter (Tompson) |

---

[1]The original indictments in this case charged "Bobby Jewel Wilson" along with the defendant. At the first trial, however, Mr. Wilson testified that his middle name is Joel.

| | | | | |
|---|---|---|---|---|
| 7 | Attempted First Degree Murder (Fogle) | Guilty of Lesser Included Offense | | Attempted Voluntary Manslaughter (Fogle) |
| 8 | Aggravated Assault by use or display of a deadly weapon (Kennedy) | Guilty | | Aggravated Assault (Kennedy) |
| 9 | Aggravated Assault by causing bodily injury (Kennedy) | Guilty | | Aggravated Assault (Kennedy) |
| 10 | Aggravated Assault by use or display of a deadly weapon (Tompson) | Guilty of Lesser Included Offense | | Reckless Aggravated Assault (Tompson) |
| 11 | Aggravated Assault by causing bodily injury (Tompson) | Guilty of Lesser Included Offense | | Reckless Aggravated Assault (Tompson) |
| 12 | Aggravated Assault by use or display of a deadly weapon (Fogle) | Guilty of Lesser Included Offense | | Reckless Aggravated Assault (Fogle) |
| 13 | Aggravated Assault by causing bodily injury (Fogle) | Guilty of Lesser Included Offense | | Reckless Aggravated Assault (Fogle) |
| 14 | Aggravated Burglary (Moss residence) | Guilty | | Aggravated Burglary |
| 15 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Robbery (Moss) | Unable to Reach Verdict | Guilty | First Degree Felony Murder (Moss) |
| 16 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Theft (Moss) | Unable to Reach Verdict | Guilty | First Degree Felony Murder (Moss) |
| 17 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Burglary (Moss) | Unable to Reach Verdict | Guilty | First Degree Felony Murder (Moss) |

*I. Trial One*

The trial court conducted the initial trial in July 2011. Lindsay Callahan, a dispatcher with Murfreesboro Police and Fire 911 Communications, testified that, on December 9, 2008, she received two telephone calls at 8:58 p.m. regarding a shooting on Searcy Street.

Officer Michael Levy with the Murfreesboro Police Department ("MPD") testified that he responded to a call of a shooting on Searcy Street on December 9. Officer Levy arrived on the scene at 9:00 p.m. along with his field training officer, Gabriel Besleaga. Upon arrival, Officer Levy "immediately noticed a black male, who [was] later identified as Tommy Moss, laying face down in the gravel driveway in front of the residence." Officer Levy could not find a pulse on the victim. While checking on the victim, Officer Levy observed two white males leaving the residence; the men were later identified as Randall Mansell and Shawn Sherfield. After Officer Levy entered the residence, he found a black female, later identified as Kaitlynn Kennedy, lying face down on the living room floor between a sofa and a coffee table; Ms. Kennedy had suffered a gunshot wound to the upper left side of her chest. Officer Levy applied pressure to the wound until emergency medical personnel arrived.

MPD Sergeant Cary Alan Gensemer testified that, in December 2008, he served as supervisor of the crime suppression unit. Sergeant Gensemer arrived at the Searcy Street scene at approximately 9:04 p.m. on December 9 and noticed "a person on the ground in the driveway of the residence that appeared to be unresponsive." When Sergeant Gensemer entered the residence, he encountered Ms. Kennedy on the floor of the living room and noticed that she "was struggling to breathe." Sergeant Gensemer also found an injured white male lying in the small hallway off the living room who "appeared to have been suffering from a gunshot wound to the chest." The man, later identified as Jeff Fogle, was conscious and told Sergeant Gensemer that "B.J. shot him." Sergeant Gensemer asked Mr. Fogle if B.J. had come to the house to rob him, and Mr. Fogle responded that B.J. "was already there." While conducting a sweep of the house, Sergeant Gensemer located a blue steel revolver on the stairs leading to the upstairs area.

MPD Detective Katrina Henderson testified that she was called to investigate the scene of the shooting at the Searcy Street residence. When she arrived, it was raining very hard, "almost like a monsoon." She first noticed a body lying in the driveway, with a car located directly behind the body, and she observed that a glass door on the front of the house was broken. Upon entering the residence, she saw a "red substance" on the floor and sofa, holes in the wall, and live ammunition throughout the house. Detective Henderson also observed a revolver lying on the staircase "with red substance about it" and broken glass in

-4-

the small hallway near the kitchen. The live ammunition Detective Henderson found was primarily .22 caliber, although she also located some nine-millimeter, .380, and .357 ammunition. With respect to the nine-millimeter ammunition, Detective Henderson located a magazine on the living room computer desk which contained some live ammunition; no nine-millimeter handgun was ever recovered. Detective Henderson retrieved the revolver found on the staircase, finding that it contained the casings of ammunition that had been fired as well as one live round. In the west bedroom on the first floor of the residence, Detective Henderson recovered a pink and silver handgun that contained no magazine or ammunition. In the living room, Detective Henderson found a bag containing a "green leafy substance," which the Tennessee Bureau of Investigation ("TBI") crime laboratory later confirmed to be marijuana. Detective Henderson observed a folded $20 bill lying on the living room floor in front of the sofa and a set of electronic scales containing a green, leafy residue on a living room table. Detective Henderson also observed a hole, believed to be a bullet hole, in the back of the black office chair located near the living room computer desk. She also found, in the east bedroom of the residence, a glass pipe containing what appeared to be marijuana residue.

Doctor Amy R. McMaster, chief medical examiner for Davidson County and chief medical officer for Forensic Medical Management Services, testified that she performed the autopsy on Mr. Moss's body. Doctor McMaster stated that Mr. Moss received three gunshot wounds: one to the back that entered on the left side, passed through his heart, lung, and ribs, and exited on the right side of his chest; one that entered the left side of his chest near his nipple, injuring his rib, lung, and heart, and exited on the right side of his back; and one that entered the left side of his chest near his arm pit, passed through his heart, lung, and rib, and exited the right side of his back. Doctor McMaster opined that "[e]ach one of the gunshot wounds in and of themselves could have been fatal" and "all three of them injured heart, lung, and rib." Doctor McMaster was unable to determine the sequence of the gunshot injuries, but she was able to say that "death would not have been immediate from any of these three wounds." Doctor McMaster agreed that it would have been possible for Mr. Moss "to run a distance before falling and expiring." The absence of soot and gun powder stippling on Mr. Moss's wounds indicated that he was more than two feet away from his shooter, or some object was between the gun and Mr. Moss when he was shot. Toxicology tests revealed the presence of tetrahydrocannabinol ("THC") and Carboxy-THC, a metabolite of marijuana, in Mr. Moss's bloodstream, indicating that he "had smoked or ingested possibly marijuana at some point very recently prior to his death." Doctor McMaster determined that the cause of Mr. Moss's death was multiple gunshot wounds and that the manner of death was homicide.

Special Agent Don Carman, a recently-retired forensic firearms examiner with the TBI, testified that he had examined a .22-caliber revolver manufactured by Heritage that

had been found at the crime scene. Special Agent Carman explained that the handgun was a single-action revolver, similar to "a cowboy type," that could hold six .22-caliber bullets. Special Agent Carman examined five fired .22-caliber cartridge cases recovered from the crime scene and determined that all five had been fired from the Heritage .22-caliber revolver.

TBI Special Agent Dabney Kirk performed fingerprint analysis on both a Heritage Rough Rider .22-caliber revolver and a Lorcin .22-caliber semi-automatic pistol with pink pearl handles. Special Agent Kirk, however, was unable to recover any identifiable prints on either weapon.

Jeff Fogle testified that, on December 9, 2008, he was 18 years of age and was residing at Tommy Moss's house at 1346 Searcy Street; David Tompson, Shawn Sherfield, Randall Mansell, and Kaitlynn Kennedy, whom Mr. Fogle knew only as "K.T.," lived there as well. Mr. Fogle explained that he shared the east bedroom with Mr. Tompson and that Mr. Sherfield and Mr. Mansell shared the west bedroom. According to Mr. Fogle, Ms. Kennedy shared the upstairs bedroom with Mr. Moss.

On the afternoon of December 9, Mr. Fogle accompanied Mr. Tompson to purchase groceries. Upon returning to the residence, Mr. Fogle and Mr. Tompson put away their groceries, and the two then spent the remainder of the afternoon in their bedroom smoking marijuana, playing video games, and watching television. Later, Mr. Fogle and Mr. Tompson returned to the kitchen to make hamburgers. Mr. Fogle testified about what happened next:

> I remember walking into the kitchen. And I noticed B.J. Wilson to my left. And then we went to go make hamburgers. And we had our – we was sitting there making all of our hamburgers. And we were cooking our bread. And then I remember hearing shots.
>
> So, I turned around to see what was going on. And then that's when I noticed B.J. with the gun pointed at me. And then I got down – I honestly remember getting down and telling him that he didn't have to do this. And then he shot me.

The gunshot, which punctured his lung and fractured a rib, caused Mr. Fogle to fall back against a kitchen cabinet. He recalled staring at the gunshot wound to his chest for a while before "looking up and notic[ing] B.J. messing with his gun." Mr. Fogle decided to charge him, grabbing Mr. Wilson and attempting to wrest the gun away from him. Mr. Fogle called

out for Mr. Mansell, who emerged from his own bedroom and assisted Mr. Fogle in his efforts to retrieve the handgun. Mr. Fogle began breaking wine glasses over Mr. Wilson's head, and he and Mr. Wilson fell onto the staircase. Mr. Fogle then managed to make it to the nearby bathroom and call 9-1-1 from Mr. Sherfield's telephone.

Mr. Fogle was aware that both Mr. Moss and Mr. Mansell owned firearms. Mr. Fogle testified that Mr. Moss owned a nine-millimeter semi-automatic handgun and that Mr. Mansell owned a .22-caliber pink and silver handgun.

On cross-examination, Mr. Fogle acknowledged that he had never met the defendant and that Mr. Wilson was the only visitor to the residence he saw on the evening of December 9. Mr. Fogle conceded that, at the defendant's preliminary hearing, he testified that he had heard seven or eight gunshots and that it sounded as though the shots came from "several different" guns.

David Tompson, who was 22 years old in December 2008, testified that he and Mr. Fogle decided to cook hamburgers on the evening of December 9, and Mr. Tompson placed hamburger buns in the toaster oven:

> And three guys entered the house. They wanted to know where [Mr. Mansell] was. I remember Thomas Moss said he doesn't know where he's at. That he might be in the back or something like that.
>
> And Jeff [Fogle] came out and said he's in his room. They walked to the . . . east bedroom, and then came back out. When I saw them, they had on hoodies. So, I couldn't identify everyone. But I know one of the people was Caucasian.
>
> And one stopped in the kitchen where me and Jeff were. The other two went out into the living room. I heard a door shut. So, I assumed somebody went outside. But then I heard a little bit of talking. I didn't really pay attention to it because it was in another room.
>
> We were continuing to cook and just standing there. I heard like a muffled – like I guess you would say like a thunder sound. Like – and faint glass shattering. And me and him looked at each other. We didn't know what to think.

> And the person in front of us pulled off his hood and pointed the gun at Jeff. And then I heard some gun shots. But I don't think it came from his gun at first. And then it shot Jeff. But right before [Mr. Fogle] did get shot he said, no, dog, no. . . .
>
> . . . .
>
> . . . And the guy that was shooting shot him any way. He went straight down and was looking at himself. I ducked down behind the glass table in the kitchen. And there was nothing for me to grab. There was nothing that I could do.
>
> So, I just stood up and I looked at him. And he shot me any ways in the head. That was my first wound. After that, things didn't seem normal. I felt like I was in a nightmare.

Mr. Tompson started to flee through the back door, but before he could escape, a bullet grazed his forehead, and he was shot once in his right side. He then heard multiple gun shots and was shot once in the back. As he made his way down the driveway toward the street, he noticed a grey car parked in front of the residence, and he thought he could hear the engine running. When he made it to a neighbor's house, the grey car drove past him down the street. While he was reporting to the neighbor that he had been shot, police cars arrived on the scene, and, shortly thereafter, an ambulance transported him to the hospital.

Mr. Tompson testified that he had been shot four times. The bullet that hit his right side ruptured his intestines, and the bullet to his back caused nerve damage. Mr. Tompson, who identified through a photographic lineup the man who shot him and Mr. Fogle, was unable to identify the other two men who entered the house on December 9. Mr. Tompson admitted that he initially told the police that all three men were white, explaining that because all three were walking together and wearing hoodies and because the first man he saw was white, he made the assumption that the other two men were white as well.

Kaitlynn Kennedy testified that she was 18 years old in December 2008. Ms. Kennedy stated that she occasionally stayed in the upstairs bedroom with Mr. Moss at 1346 Searcy Street but that, otherwise, she stayed at her mother's house. Ms. Kennedy explained that Mr. Moss was her "CEO"; he had started his own record label and he "believed in" her. In 2008, Ms. Kennedy was a vocalist and a full-time student but was also employed at a fast food restaurant. Ms. Kennedy testified that she knew the defendant from her days at Riverdale High School, stating that she had sat next to the defendant in class and that his

nickname was "Dee."

On December 9, 2008, the defendant arrived at Mr. Moss's house near noon to see Mr. Mansell. When Ms. Kennedy informed the defendant that Mr. Mansell was not home, the defendant left. The defendant was alone when he came to the door, and Ms. Kennedy did not know whether any one else was in the defendant's car. The defendant returned at approximately 3:00 p.m. or 4:00 p.m., accompanied by a white male whom Ms. Kennedy did not know. During that visit, the defendant purchased marijuana from Ms. Kennedy. When Ms. Kennedy again told the defendant that Mr. Mansell was not home, the defendant began "acting weird," saying, "[O]h, man, okay, oh, oh, man." Concerned, Ms. Kennedy and Mr. Moss asked the defendant if he was alright. The defendant responded, "[Y]eah, yeah," but Ms. Kennedy "could tell something was wrong." The defendant and the white male left.

The defendant returned to the house a third time at 8:45 p.m. Two white males were with the defendant, but one of those men "did not come to the front" and was "not in [Ms. Kennedy's] presence." Mr. Mansell was home at that time, and the defendant went back to Mr. Mansell's bedroom for one to two minutes. The defendant and one of the white males returned to the living room and began discussing music with Mr. Moss. The defendant then produced a handgun and said to Mr. Moss, "'[O]h, check out this .357 special edition I just got.'" Mr. Moss examined the handgun, then returned it to the defendant. The defendant asked Ms. Kennedy if she would like to examine the gun, but she declined. The defendant and Mr. Moss briefly continued their discussion of music, and then the defendant turned to Ms. Kennedy and asked if she "had any more good, which we refer to as marijuana." Ms. Kennedy then described what happened next:

> And I told him the honest truth. I said no. He shot my friend. He just shot him. He just shot him. He wasn't in front of me. He was behind me. And I didn't know what was going on.

> And I looked at Mr. Moss, and he had a surprised look on his face. And I was like, no. What's going on. And then I smelled the gun smoke. But Mr. Moss, he was still in shock because he had gotten shot.

> And then he ran through the glass door. And I still – I wasn't coherent to what was going on. But I knew something happened to my friend. Because you just don't run through a glass door. You just don't do that. You don't do that.

And I looked up at him and he shot me. He shot me. The impact from the gun knocked me through a glass table. And I was still in awe because I didn't – I just didn't know.

And then I looked at him and he shot me again. And I fell off the couch on to the floor. He turned away and I heard so much gun fire.

But before that, I heard my roommate, no, no. And gun fire just followed with horrifying screams. You could tell that this was a massacre. And I did not know what was going on. It was just gun fire and screams.

I heard a door slam twice in the back. And everything just got quiet. And I'm laying there bleeding. And I hear footsteps on top of paper. And I heard his voice. And he said, we have got to go back in there and kill her.

And then I seen him walk in very slow. And he walked around the other side of the table. He looked at me with a smirk and pulled his trigger. And I heard five clicks.

But at that time before he pulled his trigger, because he was doing everything so slow as if he wanted to make sure that I seen, knew, and understood what was going on, I closed my eyes and prepared myself to die.

I heard the clicks and I didn't feel any pain. And I slowly opened my eyes to find [the defendant] staring at his gun really weird. And then he looked down at me really weird. And then he looked back at his gun really weird.

And then he proceeded to run through the door. And that's when he left. I seen another Caucasian male as I'm laying there dying. He just walked through and he looked at me. Walked through to the kitchen or wherever he went to the back. I couldn't see him.

And then I noticed the same Caucasian male walk back through. This time he didn't look at me. He proceeded to exit

-10-

the house.  I just remember trying to apply pressure to myself because I was bleeding a lot.  And I would just roll back and forth over on my stomach.  And my breathing was pretty bad.

And then the next thing was my roommate, Randall.  I just heard him saying, what's going on, what's going on.  I thought he was going to help me.  He lifted me up from my left shoulder because I was laying on my stomach.  And he turned me over and he looked at me in my face.  He said huh-uh (negative).  And he put me back down on my face.  He then walked out the door.

But I noticed he was holding a firearm, too.  After that my next encounter was with the police.

Ms. Kennedy testified that the first bullet entered her chest, pierced her left lung, broke two of her ribs, and shattered the bottom portion of her left shoulder blade when it exited her body.  The second bullet entered her lower right leg, pinching a nerve, and lodged in her femur.  Because the bullet was resting on a nerve, surgical removal was not immediately possible.  Instead, Ms. Kennedy was instructed to walk and apply pressure to her right leg to force the bullet to the surface.  Approximately one month later, the bullet began to surface, and Ms. Kennedy underwent emergency surgery to remove the bullet from her leg.

From a photographic lineup, Ms. Kennedy positively identified the defendant as the man who shot her and Mr. Moss.  Ms. Kennedy also identified the two white males who accompanied the defendant on the night of the shooting.

Ms. Kennedy was aware that Mr. Moss owned a semi-automatic handgun, but she did not know where he kept the weapon, and Ms. Kennedy was also aware that Mr. Mansell owned a .22-caliber pink-handled gun.  Ms. Kennedy denied that Mr. Moss showed or in any way displayed a firearm to the defendant on the night of the shooting.  Ms. Kennedy also denied that the defendant gave her any money just prior to the shooting, explaining "there was no reason for him to give me money if we don't have any" marijuana.

On cross-examination, Ms. Kennedy explained in greater detail the manner in which the defendant, Mr. Wilson, and Mr. Heath entered the house on the evening of December 9:

Q:     When [the defendant], from your testimony, and the two

white males came the third time, did they knock on the door?

A:      No, I seen them walking to the door because we had a glass screen door.  And our front door was open.

Q:      All right.  Well, did they knock on the door?

A:      No, he just opened it.  It was not locked.

Q:      Okay.  So, [the defendant] or one of the white –

A:      No, [the defendant] was always first to come in.

Q:      So, instead he just walked right in?

A:      Yes, we seen him as well as he seen us.  He just came in and went to Randall's room.

Q:      So, he just walked right back and went to Randall's room?

A:      He didn't even ask this time because he identified the car outside.

Q:      So, you have concluded because Mr. Mansell's vehicle was out front, that they had to know that Mr. Mansell was there?

A:      Yes.

Q:      Okay.  And they went back to the back.  Did they go into Mr. Mansell's room or do you know?

A:      I was sitting on the couch.  I just know they were not in my sight at that time.

Q:      Well, how long were they in the back?

A:      I'm not sure of the time.  That would be a speculation.

But it wasn't that long.

Bobby Joel Wilson testified that he was 18 years old in December 2008 and that his nickname is B.J. Mr. Wilson stated that he knew the defendant as Dee and that, prior to the December 2008 shooting, he had only met the defendant twice. Mr. Wilson testified that he had known Coty Heath since middle school and that he considered him to be "an associate."

On December 9, 2008, Mr. Wilson received a telephone call from Mr. Heath. Mr. Heath told Mr. Wilson that "he knew where we could get some weed," and Mr. Heath asked Mr. Wilson to bring a gun. Mr. Wilson then changed clothes, retrieved his .22-caliber handgun, and drove to a local McDonald's to meet Mr. Heath and the defendant. Mr. Wilson identified video surveillance footage which showed the defendant, Mr. Heath, and himself at the McDonald's on December 9.

After eating at McDonald's, the defendant asked Mr. Wilson if the trio could take his vehicle because the defendant's car was low on gasoline, and Mr. Wilson agreed. Once inside the car, Mr. Wilson asked the men whom they planned to rob, and one of the men responded that it was "a guy named Moss." Mr. Wilson asked what Mr. Moss had that they could steal, and Mr. Heath replied that Mr. Moss "had some weed," and the defendant stated that, because Mr. Moss was a producer, he had approximately $10,000 he had saved for a promotion party. Mr. Heath and the defendant told Mr. Wilson that the three of them would split the proceeds of the robbery. When the men asked Mr. Wilson if he had brought his handgun, Mr. Wilson produced the weapon from underneath the driver's seat. The defendant then showed Mr. Wilson the gun he was wearing in a shoulder holster. The defendant told Mr. Wilson that it was a .357. Mr. Wilson assumed that he and the defendant would display the guns in order to "aggressively persuade" Mr. Moss to "give us the stuff."

The defendant provided Mr. Wilson with directions. Mr. Wilson described what happened when they reached Searcy Street:

> So, he told me to turn my car around and leave it running or whatever. So, I pulled in and backed up right there on the dead end. You know my car facing, you know, leaving or whatever. And I tucked the gun in my waist band and I got out of the car.
>
> And when I got out of the car, he said did I have some money to show him or whatever. So – to get him to pull the weed and stuff out, you know. And I said – I reached in my

pockets and I had two 20's. And I just gave him one. And I put the other one back in my pocket.

Mr. Wilson described going into the kitchen and standing there until he heard gunshots, at which point he pulled his gun and fired at the two other men in the kitchen. Then, the next thing he remembers is that:

[s]omebody was hitting me in the head with stuff. Like something glass or whatever. And it was breaking. You know what I'm saying.

And I remember being pushed down into the stairs. They started hitting me with all kind of stuff. I just kept hearing glass break or whatever. I didn't know at the time what it was. I kind of thought it was like a Mason jar or something.

. . . .

. . . So, they jerked the gun out of my hand or whatever. I think they hit me with it or something. And then I kicked Buck. I just reared back onto the steps and kicked Buck. And he fell down into the hallway. And I heard sirens and whatever. And I pushed Jeff down and I just ran.

When Mr. Wilson ran outside, he realized his car was gone. He ran to a nearby store and, once inside, he asked a store clerk if he could use a telephone to contact his sister and tell her that his car had been stolen. After contacting his sister, Mr. Wilson waited outside, and when his sister arrived, he climbed into the back of her van. The police arrived a short time later, and Mr. Wilson was arrested.

Mr. Wilson admitted that he had rejected an offer from the State of a 15-year prison sentence in exchange for his plea of guilty to "facilitation of murder, attempted murder, and robbery." Mr. Wilson testified that he had no outstanding plea offers at that time.

Coty Heath testified that he was 17 years old in December 2008 and that he had known the defendant for approximately two years. On December 8, 2008, Mr. Heath was released from a juvenile detention facility, and the defendant visited Mr. Heath at his residence that evening. The following morning, the defendant returned to Mr. Heath's house to inform him that he had recently acquired a .357 revolver. The defendant told Mr. Heath

-14-

that "he knew somebody by the name of Moss that had a pound or two of weed and some money saved up." The defendant stated that he wanted to steal marijuana from Mr. Moss and asked Mr. Heath if he would like to join him. Mr. Heath declined, explaining that his probation officer would be visiting soon. The defendant joked that Mr. Heath was afraid and stated that he would contact Marcus Johnson to see if Mr. Johnson would join him instead. The defendant then left Mr. Heath's house around 9:00 or 9:30 a.m.

Later that evening, Mr. Heath contacted the defendant to ask if the defendant had "done it yet." When the defendant replied that he had not, Mr. Heath invited him to return to his house to "drink some liquor." The defendant agreed, and, at Mr. Heath's house, discussions of robbing Mr. Moss resumed. Mr. Heath explained that he did not have a handgun, and the defendant asked if Mr. Heath knew of anyone who did. Mr. Heath then called Mr. Wilson and asked if he would be interested in "rob[bing] somebody for some weed." Mr. Wilson expressed interest, and he agreed to meet Mr. Heath and the defendant at McDonald's.

After spending approximately 30 minutes at McDonald's, the three men left for Mr. Moss's residence in Mr. Wilson's vehicle. The plan was for the defendant "to stick up Moss and pull the gun on him. And B.J. was supposed to hold the gun on whoever else was in the house. And I was just supposed to get the weed or whatever they had." Mr. Heath then testified similarly to Mr. Wilson about the prelude to the shootings. He then stated:

> I guess something went wrong. Maybe Moss seen the signal or whatever and did something. Gun shots just went off. Dee made the signal behind his back. I'm looking at his thumb. And then gun shots just started going off.
>
> And the next thing I know Moss – I look up and I see Moss is already out the door and Dee is standing behind him. Dee is at the door. He shot at him two or three times at the door. And then turns around and walks over to K.T. She's already laying on the ground.

Mr. Heath explained that, because he was staring at the defendant's back when the defendant gave the signal, he didn't see the initial gunfire. Mr. Heath saw Mr. Moss run through the front door, and he saw the defendant shoot Mr. Moss "like two or three times."

The gun shots "spooked" Mr. Heath, prompting him to "grab[] the weed off of the table and run out the door." When he reached the front porch, he encouraged the defendant to follow him, but the defendant was standing over Ms. Kennedy and told Mr.

Heath, "I got to finish this." Mr. Heath watched the defendant "pull the trigger again," but the weapon did not fire. At that point, the defendant followed Mr. Heath out of the house. Mr. Heath "yelled for B.J. on the way out the door to come on," but Mr. Wilson did not follow them. Just before he left the residence, Mr. Heath heard gun shots and saw Mr. Wilson "shooting towards the kitchen, two people in the kitchen."

Mr. Heath described the scene as he and the defendant left:

So, we run and get in the car. There was a dude standing on the street. He's got blood on him or whatever. He's got blood on him. And I walk in front of him and get in the passenger seat. Dee gets in the driver's seat. And, you know, he's like FF, you know what I'm saying. And I'm like – I guess he was kind of shaken up by whatever. And he was like, you know what I'm saying, what did you get. I was like, man, all I got is this. It was about an ounce, around an ounce, maybe two. And he's like, f***. So, we go to drive off. And he's like, at least I can say I killed somebody.

On the way to Mr. Heath's house, the defendant stopped at a motel room to attempt a telephone call, but he did not get through to the intended party. The defendant and Mr. Heath left Mr. Wilson's vehicle in the motel parking lot and crossed the street to the McDonald's to retrieve the defendant's car. While en route to Mr. Heath's house, the defendant placed another telephone call and said that he intended "to put the gun in the mailbox." The defendant then drove to a location on Country Farm Road and left the gun in the mailbox.

When they arrived at Mr. Heath's house, the defendant told Mr. Heath, "[Y]ou better not testify against me. You know, I can do the rest of my life in jail, whatever. And you know what I'm saying, he knew where I lived and stuff like that." After the defendant left his house, Mr. Heath went outside and "stomped [the marijuana] in the ground."

Police officers arrived at Mr. Heath's house the following morning. Mr. Heath initially refused to make a statement. Thirteen months later, Mr. Heath gave a statement to police officers, but he lied, telling officers that he had stayed in the car while the defendant and Mr. Wilson went inside Mr. Moss's house on December 9. Mr. Heath explained that he had lied because he wished to avoid being "charged with felony murder for taking the weed." Mr. Heath testified that he was telling the truth at trial and admitted that he was guilty of the offense of felony murder. Mr. Heath denied that he had received any offers from the State in exchange for his testimony.

MPD Detective J.D. Vaught testified that, on December 9, 2008, he responded to a call of shots fired on Searcy Street. He arrived shortly after 9:00 p.m. and was approached by Marcus Johnson. Detective Vaught later provided a supplementary report which included the information he received from Mr. Johnson.

MPD Sergeant Don Fanning testified that he arrived on the scene of the shooting at approximately 1:00 a.m. on December 10. While Sergeant Fanning was seated in his vehicle 75 to 100 yards from the crime scene, a black male, later identified as Marcus Johnson, knocked on his car window. After speaking with Mr. Johnson, Sergeant Fanning contacted his supervisor to inform him about his interaction with Mr. Johnson. Sergeant Fanning asked Mr. Johnson to provide a written statement. Mr. Johnson then showed Sergeant Fanning his cellular telephone and the text messages he had received on it. Sergeant Fanning photographed the text messages and turned the photographs over to detectives.

Marcus Johnson, who was 21 years old in December 2008, testified that he knew the defendant simply as "Dee." On December 9, 2008, Mr. Johnson encountered the defendant at the Tremont Apartments around noon. Mr. Johnson asked the defendant to drive him to the store so that he could purchase diapers for his daughter. While the two men were driving around, the defendant mentioned that he needed money to pay his car note, and he asked Mr. Johnson if he would "do a robbery" with him, but Mr. Johnson declined. The defendant then showed Mr. Johnson his .357 revolver. The defendant received a telephone call, and during the course of the call, the defendant said "he was going to go back and rob that old dude, something like that." Mr. Johnson described the conversation he had with the defendant following the defendant's telephone call:

> He asked me would I ever be with him when he killed somebody. I said no. He said why not. He wanted me to be there. I told him, no, I couldn't do that.
>
> And the conversation carried on some more. I told him why would you just kill somebody. Why wouldn't you just rob them. You know, you can just rob a person. You ain't got to kill a person. Well, he said that if you did rob somebody if you knew the person, he would kill them. Just the fact is they would know him and they didn't want to – he didn't want them coming back to get at him. So, he would get them first so they wouldn't get back at him.

The defendant then drove to Mr. Moss's residence. He asked Mr. Johnson to

accompany him inside, but Mr. Johnson declined. Mr. Johnson observed the defendant knock on the front door and speak with Mr. Moss briefly. When the defendant returned to the car, he told Mr. Johnson that he was looking for Mr. Mansell. When he learned that Mr. Mansell was not at home, he left.

The defendant and Mr. Johnson then attended a party for a short period of time. The defendant left, telling Mr. Johnson that he would return later. Mr. Johnson later attempted to contact the defendant by telephone, but the defendant did not answer, and the defendant never returned to the party.

Later that evening, Mr. Johnson was en route to Wal-Mart when he saw an ambulance and fire trucks heading toward the Searcy Street area. Because Mr. Johnson's sister lived at 1302 Searcy Street and because Mr. Johnson knew his nephew to suffer from severe asthma, he became concerned that there was an emergency at his sister's house. When he arrived at his sister's house, he noticed the emergency vehicles parked down the street at Mr. Moss's house. Mr. Johnson approached an officer at the scene and asked what had happened. After speaking with the officer, Mr. Johnson returned to his sister's house and tried to contact the defendant. The defendant returned Mr. Johnson's call, and Mr. Johnson recounted the conversation as follows:

> Well, he told me it was a robbery gone wrong that was over there. And just everything went wrong. Just the robbery went wrong. Then we started talking for a little while. He told me that B.J. was with him. B.J. had got killed with a shotgun, a 12-gauge shotgun. He said B.J. was dead. So, I figured he was dead because he was still in the house. But I didn't know B.J. was there with them. I didn't know anything about that.

> And he told me – he had told me he had shot K.T. twice, and he had shot Moss twice. But after that, we hung up the phone. We hung up the phone.

Mr. Johnson then continued his communication with the defendant through text messages. The defendant sent Mr. Johnson a text message asking him to go to the hospital and report back to him on who had lived and who had died. After ascertaining that information, Mr. Johnson called the defendant and informed him "who was alive and who was dead and everything else. Well, he didn't want to hear that news. News he didn't want to hear."

Mr. Johnson's family encouraged him to go to the police, but Mr. Johnson

considered his options for a while. His sister called him, informing him that a detective had come to her house and told her to have Mr. Johnson contact him. Mr. Johnson then returned to Searcy Street and located the detective who wished to speak with him. After speaking with the detective, Mr. Johnson wrote a statement and relinquished his cellular telephone to the detective, who photographed the text messages Mr. Johnson had received. Through Mr. Johnson's testimony, the State introduced into evidence those photographs of the incoming text messages, all of which purport to be from "Bra Dee" and all but the first of which have what appears to be a signature line stating "My everything":

| | |
|---|---|
| Tue., Dec. 9 11:38 p.m. | Heard n.e.thing newdy everything |
| Tue., Dec. 9 11:43 p.m. | Yea I can only text on my phone I ran out of money |
| Tue., Dec. 9 11:46 p.m. | I kno did they mention names |
| Tue., Dec. 9 11:49 p.m. | F[***] bruh did u talk to k.t. |
| Tue., Dec. 9 11:50 p.m. | And did n.e. one die |
| Tue., Dec. 9 11:54 p.m. | Goddamn it im f[*****] |
| Tue., Dec. 9 11:56 p.m. | I don't know bruh |
| Wed., Dec. 10 12:01 a.m. | Naw not really bruh I just don't know |

Through Mr. Johnson, the State also introduced photographs of incoming and outgoing calls received and placed on Mr. Johnson's cellular telephone and the length of each of those calls:

| | |
|---|---|
| Tue., Dec. 9, 1:11 p.m. | Incoming call from "Bra Dee"; 12 seconds |
| Tue., Dec. 9, 9:19 p.m. | Outgoing call to "Bra Dee"; 3 minutes, 10 seconds |
| Tue., Dec. 9, 9:27 p.m. | Outgoing call to "Bra Dee"; 8 minutes, 47 seconds |
| Tue., Dec. 9, 10:51 p.m. | Outgoing call to "Bra Dee"; 2 minutes, 9 seconds |
| Tue., Dec. 9, 10:58 p.m. | Incoming call from "Bra Dee"; 42 seconds |
| Tue., Dec. 9, 11:42 p.m. | Outgoing call to "Bra Dee"; 20 seconds |

MPD Detective Paul Mongold testified that he "heard the call" on December 9, 2008, and that he arrived on the scene shortly after 9:00 p.m. Mr. Tompson was being attended to by an MPD officer, and Detective Mongold observed the body of Mr. Moss in the driveway. When Detective Mongold entered the residence, he saw paramedics treating

Ms. Kennedy, and he photographed Mr. Fogle, who was receiving aid from paramedics as well. Detective Mongold testified that the weather conditions were bad, describing the scene as a "monsoon."

Detective Mongold knew that multiple rounds of ammunition had been discovered in the house, but he did not send any of the rounds to the TBI crime lab for testing, explaining that, in his 13 years in law enforcement, he had "never known any investigator or officer that's sent a bullet off to be examined to the police department that gets a fingerprint back."

Detective Mongold testified that he interviewed Mr. Mansell, Mr. Sherfield, and Mr. Wilson. Mr. Wilson provided him with the names of the defendant and Mr. Heath. Detective Mongold obtained the video surveillance footage from McDonald's showing Mr. Wilson, Mr. Heath, and the defendant together shortly before the shooting.

The defendant was brought to the police station on the morning of December 10, and Detective Mongold conducted his interview. The trial court admitted into evidence the rights waiver form signed by the defendant on December 10. The initial interview lasted over six hours, and, through Detective Mongold's testimony, the State introduced into evidence and played for the jury a redacted one-hour version of the video recording of that interview. Following his interview of the defendant, Detective Mongold interviewed Ms. Kennedy, Mr. Fogle, and Mr. Tompson.

Through cellular telephone records, Detective Mongold verified that the defendant had been in contact with both Mr. Johnson and Mr. Mansell on December 9 and that Mr. Wilson had been in contact with Mr. Heath on that same date.

The trial court admitted into evidence the following note written by the defendant, which he gave to deputies while he was incarcerated:

> Jonathan Alajemba
> Contact Det. Mongold @ MPD And tell him I want to make a
> statement and Official Confession about my Ongoing Murder
> Case and I waiver [sic] my right to have my attorney present.

On December 22, 2009, Detective Mongold again interviewed the defendant, following the defendant's execution of another waiver of his rights. The trial court admitted into evidence the video recording of that interview, as well as the defendant's 4-page, single-spaced written statement. In the statement, the defendant detailed the preparations for the robbery of the victim leading up to their arrival at the victim's house:

So we walk to the house and I knock on the storm door and Moss opens up the front door and sees me and lets us in so we walk inside I walked towards the kitchen seen Re-run and Jeff and stood next to the couch and B.J. & Coty stood to the left and back of me by the stairs. I give K.T. a $20 bill and told her to give me a dub. So she weighs the weed and bags it up and gives it to me. Then B.J. asked Moss where is Buck and Moss says he's asleep. Then me and Moss started talking about misc. things like his nephew, weed and his promotion party he was having. . . . Moss pulls out a gun from somewhere. I'm not fully sure where it came from and puts a clip in it and starts pointing it towards me without saying a word. So I then shot him in the chest area twice then I see K.T. move to my right so I turn to her and I see her dig into the couch and pulls out a small chrome looking gun so I remember shooting her twice then I look towards Moss and he is running towards the door and I shot again and the storm door shatters and he runs outside and I move in front of the coffee table and I see Moss running then he falls face down in the ground then I went outside and stood over Moss's body for a few seconds and to my left Re-run runs out from the back of the house running towards the front and he runs to B.J.'s parked car and falls down by the passenger side door. . . .

Following this account, the defendant described departing the scene and disposing of his pistol.

Detective Mongold testified that, despite the defendant's assertion that Mr. Moss pointed a gun at him, the MPD never located Mr. Moss's handgun in the residence. Although the defendant denied conspiring with Mr. Heath to rob Mr. Moss, he did admit that he owned a .357 revolver and that he had spoken with Mr. Heath about using that revolver in a robbery.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected not to testify and did not present any proof.

Based on this evidence, the jury reached the following verdicts:

| COUNT | CHARGE (VICTIM) | CONVICTION |
|---|---|---|
| 1 | Conspiracy to Commit Especially Aggravated Robbery | Guilty of Lesser Included Offense of Facilitation of Conspiracy to Commit Especially Aggravated Robbery |
| 2 | Attempted Especially Aggravated Robbery (Moss) | Guilty as Charged |
| 3 | First Degree Premeditated Murder (Moss) | Not Guilty of First Degree Premeditated Murder; Unable to Reach Verdict on Lesser Included Offense of Second Degree Murder |
| 4 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Murder (Moss) | Not Guilty |
| 5 | Attempted First Degree Murder (Kennedy) | Guilty as Charged |
| 6 | Attempted First Degree Murder (Tompson) | Guilty of Lesser Included Offense of Voluntary Manslaughter |
| 7 | Attempted First Degree Murder (Fogle) | Guilty of Lesser Included Offense of Voluntary Manslaughter |
| 8 | Aggravated Assault by use or display of a deadly weapon (Kennedy) | Guilty as Charged |
| 9 | Aggravated Assault by causing bodily injury (Kennedy) | Guilty as Charged |
| 10 | Aggravated Assault by use or display of a deadly weapon (Tompson) | Guilty of Lesser Included Offense of Reckless Aggravated Assault |
| 11 | Aggravated Assault by causing bodily injury (Tompson) | Guilty of Lesser Included Offense of Reckless Aggravated Assault |
| 12 | Aggravated Assault by use or display of a deadly weapon (Fogle) | Guilty of Lesser Included Offense of Reckless Aggravated Assault |
| 13 | Aggravated Assault by causing bodily injury (Fogle) | Guilty of Lesser Included Offense of Reckless Aggravated Assault |
| 14 | Aggravated Burglary (Moss residence) | Guilty as Charged |
| 15 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Robbery (Moss) | Unable to Reach Verdict |
| 16 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Theft (Moss) | Unable to Reach Verdict |
| 17 | First Degree Felony Murder in the perpetration of or attempt to perpetrate a Burglary (Moss) | Unable to Reach Verdict |

The defendant was tried a second time on the second degree and felony murder charges, as will be discussed fully herein. Following the defendant's second trial and the trial court's denial of his unsuccessful motion for new trial, the defendant filed a timely notice of appeal. As pertains to his first trial, the defendant contends that the trial court erred by denying his motion to dismiss for a violation of his right to a speedy trial; that the trial court erred by denying his motion to suppress the incriminating statement he gave to law enforcement officers; that the trial court erred by denying his motion seeking transcription of witnesses' recorded statements; and that the evidence adduced at trial was insufficient to support his convictions of facilitation of conspiracy to commit especially aggravated robbery, attempted especially aggravated robbery, and aggravated burglary. We consider each claim in turn.

*A. Speedy Trial*

Although the defendant, in his first issue, assigns error to the trial court based on its denial of his motion to dismiss for a violation of his right to a speedy trial, we perceive the issue to be simply whether the defendant's right to a speedy trial was violated, and we will address it as such.

By statute and by federal and state constitutional guarantees, an accused has the right to a speedy trial. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also* Tenn. Code Ann. § 40-14-101. "'The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial.'" *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) (quoting *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997)).

A reviewing court considers four factors when determining whether the right to a speedy trial has been compromised: (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right to speedy trial, and (4) any prejudice to the defendant occasioned by the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973). Of these factors, the most important is prejudice, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." *State v. Vance*, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994). To activate the four-part inquiry, the interval between accusation and trial must be "presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992). Whether the length of the delay qualifies as presumptively prejudicial turns upon the peculiar circumstances of each case, and delay that will be tolerated for "an ordinary street crime" is generally much less than for a serious, complex felony charge. *Barker*, 407 U.S. at 530-31. That being said, a delay approaching one year usually activates the inquiry. *See Vickers*, 985 S.W.2d at 5. On appeal, the trial court's application of the four-part balancing test is reviewed for abuse of discretion.

*State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996).

Regarding the length of delay factor, the defendant's initial trial commenced on July 18, 2011. He was arrested on December 10, 2008; therefore, the delay between accusation and trial was just over two years and seven months. Given the delay of more than a year between the defendant's arrest and initial trial, further inquiry is warranted. *Barker*, 407 U.S. 531; *Bishop*, 493 S.W.2d at 83-84. We cannot say, however, "this period of delay is not necessarily unreasonable when compared to other cases." *State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001) (delay of 23 months deemed "not necessarily unreasonable"). Given the fact that the defendant was charged with 17 felonies, including eight Class A felonies, the 31-month delay was not egregious.

Next, we consider the reason for the delay. The reasons for delay fall within four categories: (1) intentional delay for tactical advantage or to harass the accused; (2) bureaucratic indifference or negligence; (3) necessary delay for fair and effective prosecution; and (4) delay in which the defense has been complicit. *State v. Wood*, 924 S.W.2d 342, 346-47 (Tenn. 1996). The first reason weighs heavily against the State, whereas negligence or oversight are considered against the government but afforded comparatively more neutral weight. *Barker*, 407 U.S. at 531.

In the instant case, nothing in the record explains the seven-month delay between the defendant's January 2009 preliminary hearing and the August 2009 presentation of his case to the grand jury. Nothing indicates, however, that this delay was intentional on the part of the State. Three weeks after the grand jury charged the defendant in the instant case, the public defender's office was forced to withdraw from its representation of the defendant due to a conflict of interest. New counsel was appointed in early September 2009, and that attorney moved to withdraw from the case in December, also citing a conflict of interest. Mr. Anglin was appointed to represent the defendant on January 14, 2010, and the hearing on the defendant's motion to dismiss for violating his right to a speedy trial occurred on April 15, 2010. The trial court entered an order denying the defendant's motion to dismiss on April 21. The record reveals that the case was set for trial on February 14, 2011, but defense counsel sought and was granted a continuance. In March, defense counsel sought to withdraw from the case, citing difficulties with the defendant, but the trial court denied the motion. The case proceeded to trial on July 18, 2011. Based on this timeline of events, it is apparent that the 23-month delay between the issuance of the indictment and trial was occasioned, in part, by the necessary changes in defense counsel due to conflicts of interests as well as the defendant's own request for a continuance and the necessary preparation involved for a case of this magnitude. We are therefore persuaded that the bulk of the delay in this case can be classified as either "necessary delay for fair and effective prosecution" or "delay in which the defense has been complicit," *see Wood*, 924 S.W.2d at 347, and,

accordingly, this factor does not support a determination that the defendant was deprived of his right to a speedy trial.

Regarding the assertion of the right to a speedy trial, we regard the defendant's April 2010 motion to dismiss as the invocation of this right. The following February, however, the defendant sought and was granted a continuance. This factor favors the defendant, but it is entitled to slight weight.

The final *Barker* factor relates to the prejudice resulting from the delay. *Barker*, 407 U.S. at 531; *Bishop*, 493 S.W.2d at 83-84. The defendant has three interests protected by the prejudice factor: (1) preventing oppressive pretrial incarceration; (2) minimizing the accused's anxiety and concern; and (3) limiting the possibility of impairment to preparation of the defense. *Barker*, 407 U.S. at 532. The prejudice inquiry is the most important of the *Barker* considerations, particularly as regards the ability to prepare a defense. *See Vance*, 888 S.W.2d at 778.

The petitioner has made only the most basic attempt at showing prejudice, and we find none. Although the defendant, in his effort to show that his lengthy pretrial incarceration occasioned his mental instability, references multiple incident reports documenting his threats and violent outbursts while incarcerated pretrial, we fail to see how the defendant's propensity for violence supports his argument of prejudicial delay.

In balancing the *Barker* factors, we find no abuse of discretion in the trial court's determination that the defendant suffered no speedy trial violation.

*B. Motion to Suppress*

The defendant next contends that the trial court erred by denying his motion to suppress the inculpatory statement he provided to Detective Mongold on December 22, 2009, claiming that the statement was obtained in violation of his constitutional rights. Specifically, the defendant claims that his Sixth amendment right to counsel was violated because the statement was taken while he was represented by counsel. We disagree.

At the suppression hearing, Detective Mongold testified that, around December 20, 2009, he received a telephone call from the Rutherford County Sheriff's Department as well as a handwritten note from the Sheriff's Department, purportedly written by the defendant, which stated that the defendant wished to give a confession to Detective Mongold. Detective Mongold contacted the district attorney's office and was informed that he could speak with the defendant. On December 29, Detective Mongold visited the defendant in jail; the defendant gave no indication that he was surprised to see the detective nor did he refuse

to speak with him. Detective Mongold, who was aware that the defendant was represented by counsel, provided the defendant with his *Miranda* warnings and specifically asked if "he wish[ed] to waive his right to his counsel." The defendant signed a waiver of his rights and proceeded to give a full written confession to Detective Mongold, in which the defendant admitted, among many other things, shooting both Mr. Moss and Ms. Kennedy.

The trial court denied the defendant's motion to suppress, finding that the defendant "initiated this communication," which "he had the right to do," and that the defendant "waive[d] his Sixth Amendment right without notifying his attorney." In addition, the trial court found "that [Detective Mongold] presented and [the defendant] executed a waiver of his rights under the Fifth Amendment as well."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal

prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[2]

The Sixth Amendment to the United States Constitution guarantees that, "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. A defendant has the right to counsel at all "'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (quoting *United States v. Wade*, 388 U.S. 218, 224 (1967)). The right to counsel embodied in the Sixth Amendment, however, "'attaches only at or after the initiation of adversary proceedings against the defendant . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). This interpretation comports with the underlying purposes of the Sixth Amendment:

> That interpretation of the Sixth Amendment right to counsel is consistent not only with the literal language of the Amendment, which requires the existence of both a "criminal [prosecution]" and an "accused," but also with the purposes which we have recognized that the right to counsel serves. We have recognized that the "core purpose" of the counsel guarantee is to assure aid at trial, "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor."

*Gouveia*, 467 U.S. at 188-89 (quoting *United States v. Ash*, 413 U.S. 300, 309 (1973)). In Tennessee, an arrest warrant, or a preliminary hearing if no arrest warrant precedes the hearing, or an indictment or presentment when the charge is initiated by the grand jury, marks the initiation of criminal charges after which the Sixth Amendment right to counsel attaches.

---

[2]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

*State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980).

Upon our review, we conclude that the record supports the trial court's findings that the defendant's statement was voluntarily given and that he had waived his right to counsel. The defendant appears to advance the position that Detective Mongold was required to contact defense counsel before speaking with the defendant. This, quite simply, is not the case. As the Supreme Court has observed,

> [o]ur precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. . . . The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. . . . And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment:
>
> > "As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."

*Montejo v. Louisiana*, 556 U.S. 778, 786-87 (2009) (quoting *Patterson v. Illinois*, 487 U.S. 285, 296 (1988)); *see also State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989). In a case wherein the defendant, charged with felony murder, initiated contact with law enforcement officers and gave voluntary statements, even though he was represented by counsel, this court affirmed the trial court's denial of the defendant's motion to suppress, stating as follows:

> After a careful consideration of the defendant's claim that the statements made to police after the appointment of counsel should have been suppressed, we conclude otherwise. There are several reasons: first, the defendant was given his *Miranda* rights before each statement, *see Owens v. State*, 561 S.W.2d 167, 169 (Tenn. Crim. App. 1978) (the defendant, who was given his *Miranda* rights, voluntarily waived right to counsel

where he sent for police, even though police did not contact defense counsel prior to statement); second, the defendant clearly initiated each contact, *see State v. Claybrook*, 736 S.W.2d 95, 102-03 (Tenn. 1987) and *State v. Zagorski*, 701 S.W.2d 808, 812 (Tenn. 1985), *cert. denied*, 478 U.S. 1010 (1986); and third, defense counsel conceded during the suppression hearing that he had never instructed law enforcement officials not to talk to his client outside his presence. *See State v. Berry*, 592 S.W.2d 553, 561 (Tenn.), *cert. denied*, 449 U.S. 887 (1980) (holding that statements made to a jail informant, although voluntary, were inadmissible as a violation of defendant's sixth amendment right, in part, because defendant's attorney had specifically instructed officers not to question his client outside his presence). *But see McPherson v. State*, 562 S.W.2d 210, 212-13 (Tenn. Crim. App. 1977) (finding waiver of right to counsel even where defense counsel had instructed authorities to take no statements from his client without his presence, where statement taken in presence of neutral third party corroborated the waiver).

*State v. Baker*, 931 S.W.2d 232, 235-36 (Tenn. Crim. App. 1996).

In the instant case, the defendant, of his own volition, contacted Detective Mongold and expressed his desire to give a confession. When Detective Mongold arrived to speak with the defendant, the defendant freely and voluntarily waived his constitutional rights, including his right to counsel, and signed a rights waiver; the defendant's decision to waive his rights "need not itself be counseled." *Montego*, 556 U.S. at 786 (citing *Harvey*, 494 U.S. at 352-53). Thus, the trial court did not err by denying the defendant's motion to suppress.

### C. Motion for Transcription of Statements

Next, the defendant argues that the trial court erred by denying his motion for transcription of witness statements. Again, we disagree.

On April 8, 2010, more than one year before trial, the defendant filed a motion requesting transcription of the video-recorded statements of 14 potential witnesses. At the hearing on the defendant's motion, defense counsel argued that transcription of the video recordings was necessary "[b]ecause it's very difficult to cross[-]examine witnesses with a" video recording. When the trial court inquired as to the time involved in the recordings,

defense counsel responded that it "var[ied] dramatically," explaining that it had taken him "four days to go through those [digital video discs]." The trial court ultimately denied the defendant's motion and noted during argument on the motion that it was "unaware of any obligation the State has or the Court has to provide that type of service on behalf of the [d]efendant."

"There is no constitutional right to general discovery in a criminal case." *State v. Schiefelbein*, 230 S.W.3d 88, 147 (Tenn. Crim. App. 2007) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *Weatherford v. Bursey*, 429 U.S. 545 (1977)). Instead, the discovery of evidence by a criminal defendant is governed primarily by the Tennessee Rules of Criminal Procedure. Specifically, Criminal Procedure Rule 16(a) provides for the disclosure of, among other things, the defendant's oral statements; the defendant's written or recorded statements; the defendant's prior record; and reports of examinations and tests. Tenn. R. Crim. P. 16(a)(1)(A), (B), (E), (G). Rule 16(a) also provides for information that is not subject to disclosure on the part of the State:

> Except as provided in paragraphs (A), (B), (E), and (G) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal state documents made by the district attorney general or other state agents or law enforcement officers in connection with investigating or prosecuting the case. *Nor does this rule authorize discovery of statements made by state witnesses or prospective state witnesses.*

Tenn. R. Crim. P. 16(a)(2) (emphasis added).

Tennessee Rule of Criminal Procedure 26.2 provides that, following the direct trial examination testimony of a witness other than the defendant and on motion of, in this case, defense counsel, the court "shall order the attorney for the state . . . to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony." Tenn. R. Crim. P. 26.(a). A "statement" includes either a written statement made and signed, or otherwise adopted by, the witness, or "[a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f).

In the instant case, the defendant not only received digital video disc ("DVD") recordings of the prior statements of the State's witnesses, he received them more than one year before he was entitled to them under Tennessee Rules of Criminal Procedure 16(a)(2)

-30-

and 26.2(a). Nothing requires the State or the trial court to order transcription of those statements, and, accordingly, the trial court did not err by denying the defendant's motion for the same.

## D. Sufficiency

In his final issue relative to the first trial, the defendant contends that the evidence was insufficient to support his convictions of facilitation of conspiracy to commit especially aggravated robbery, attempted especially aggravated robbery, and aggravated burglary. The State argues that the evidence adduced at trial supports the jury verdict.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[e]specially aggravated robbery is robbery as defined in § 39-13-401 . . . [a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Criminal conspiracy is defined as follows:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

. . . .

> (d) No person may be convicted of conspiracy to commit
> an offense, unless an overt act in pursuance of the conspiracy is
> alleged and proved to have been done by the person or another
> with whom the person conspired.

*Id.* § 39-12-103(a), (d). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a).

Criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense," does one of the following:

> (1) Intentionally engages in action or causes a result that would
> constitute an offense, if the circumstances surrounding the
> conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the
> offense, and believes the conduct will cause the result without
> further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a
> result that would constitute the offense, under the circumstances
> surrounding the conduct as the person believes them to be, and
> the conduct constitutes a substantial step toward the commission
> of the offense.

*Id.* § 39-12-101(a).

"A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony . . . ." *Id.* § 39-14-402(a)(1). Aggravated burglary is "burglary of a habitation." *Id.* § 39-14-403(a).

With respect to the convictions of facilitation of conspiracy to commit especially aggravated robbery and attempted especially aggravated robbery, the proof adduced at trial established that, on the morning of December 9, 2008, the defendant visited Coty Heath at his home, told Mr. Heath of his newly-acquired .357 revolver, and asked Mr.

-32-

Heath to join him in robbing Mr. Moss of "a pound or two of weed and some money." Concerned over his probation status, Mr. Heath declined, and the defendant told Mr. Heath that he planned to approach Marcus Johnson about committing the robbery. A few hours later, the defendant asked Mr. Johnson to commit the robbery with him, and Mr. Johnson also declined. Mr. Heath contacted the defendant later that evening, and, upon learning that the defendant had not yet committed the robbery, invited the defendant to return to his house, where discussions of robbing Mr. Moss resumed. When Mr. Heath told the defendant that he did not have a handgun, the defendant asked him if he knew of anyone who did. Mr. Heath then called Mr. Wilson and asked if he would be interested in "rob[bing] somebody for some weed." Mr. Wilson expressed interest, and he agreed to meet Mr. Heath and the defendant at McDonald's after retrieving his own handgun.

The three men discussed their plan at McDonald's, which, according to Mr. Heath, was "to stick up Moss and pull the gun on him. And B.J. was supposed to hold the gun on whoever else was in the house. And I was just supposed to get the weed or whatever they had." The defendant told Mr. Wilson that Mr. Moss had saved approximately $10,000 for a music promotion party he was planning and that the three men would spilt the proceeds of the robbery. The men drove to Mr. Moss's residence in Mr. Wilson's vehicle. Upon arrival at the house, the defendant instructed Mr. Wilson to back the car into the driveway and to leave the motor running so the men "could make a quick get away." The defendant asked Mr. Wilson to provide him with money that he could show Mr. Moss in order to entice him to produce the marijuana. Mr. Wilson provided the defendant with one of his two $20 bills.

When the men entered the house, Mr. Wilson stood in the kitchen and kept an eye on Mr. Fogle and Mr. Tompson and planned to "point [his] gun at them" if they attempted "to proceed towards us." Mr. Heath stood in the living room behind the defendant, who was speaking with Mr. Moss and Ms. Kennedy. The defendant asked Ms. Kennedy "for a dub sack for the $20," and Mr. Heath observed Ms. Kennedy place marijuana on the table and begin "breaking it up." At that point, the defendant "reached behind his back" and gave a "thumbs up" signal for Mr. Heath and Mr. Wilson "to draw down on them." Because Mr. Heath was positioned behind the defendant, he was unable to see what transpired, but he surmised that "something went wrong," offering the possibility that Mr. Moss had seen the defendant's signal. Mr. Heath testified that "gun shots just started going off." After observing the defendant shoot Mr. Moss "two or three times at the door," he saw the defendant again attempt to shoot Ms. Kennedy, who was already lying wounded on the floor.

Mr. Heath "grabbed the weed off of the table" and ran out the door. Once he and the defendant were in the car, the defendant asked Mr. Heath, "[W]hat did you get," and Mr. Heath showed him the small amount of marijuana he had taken, which he estimated to

be "around an ounce, maybe two." When Mr. Johnson spoke with the defendant after the shooting, the defendant told Mr. Johnson that "it was a robbery gone wrong."

Viewing this evidence in the light most favorable to the prosecution, we hold the evidence adduced at trial more than sufficiently established, with respect to the conviction of facilitation of conspiracy to commit especially aggravated robbery, that the defendant "knowingly furnished substantial assistance" in conspiring with Mr. Heath and Mr. Wilson to promote the commission of the robbery of the occupants of the Moss residence. The defendant intended that the robbery would be accomplished through the use of deadly weapons, and the intended robbery resulted in serious bodily injury to four of the occupants of the house. *See* T.C.A. §§ 39-11-403(a), -12-103(a), (d), -13-401(a), -13-403(a). Furthermore, the evidence more than sufficiently established that the defendant acted with intent to rob Mr. Moss through the use of a deadly weapon and the infliction of serious bodily injury on Mr. Moss. *See id.* §§ 39-12-101(a)(2), -13-403(a).

With respect to the conviction of aggravated burglary, however, the State failed to prove one of the essential elements of the crime: the lack of effective consent. Our Code defines effective consent as follows:

> "Effective consent" means assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when:
>
> (A) Induced by deception or coercion;
>
> (B) Given by a person the defendant knows is not authorized to act as an agent;
>
> (C) Given by a person who, by reason of youth, mental disease or defect, or intoxication, is known by the defendant to be unable to make reasonable decisions regarding the subject matter; or
>
> (D) Given solely to detect the commission of an offense;

*Id.* § 39-11-106(9). "Deception" occurs when a person knowingly does one of the following:

> (i) Creates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe

-34-

to be true; [or]

. . . .

    (iii) Fails to correct a false impression of law or fact the person knows to be false and:

        (a) The person created; or

        (b) Knows is likely to influence another;

*Id.* § 39-11-106(a)(6)(A).

Our supreme court recently addressed the different types of deception contemplated by this statute:

> By the unambiguous terms of our statute, deception may involve an affirmative act by a criminal actor – as when a person creates or reinforces a false impression of law, fact, value, intention, or other state of mind – but also may involve a passive act, as when a person fails to correct a false impression of law or fact. There is a key distinction, however, in the statutory language as to the types of affirmative acts that may qualify as deception and the types of passive acts that may qualify as deception. An affirmative act of deception may occur when a person uses words or conduct to create or reinforce "false impressions of *fact, law, value or intention or other state of mind*." A passive act of deception, on the other hand, only occurs if a person fails to correct "a false impression of *law or fact*." Noticeably absent is a failure to correct a false impression of intention or other state of mind. Based upon our principles of statutory construction, we must presume that the General Assembly's exclusion of "value or intention or other state of mind" in subsection (iii), which is included in subsection (i), was purposeful.

*State v. Pope*, 427 S.W.3d 363, 371 (Tenn. 2013) (statutory citations omitted) (citing *State v. Hawk*, 170 S.W.3d 547, 551 (Tenn. 2005); *State v. Loden*, 920 S.W.2d 261, 265 (Tenn. Crim. App. 1995)).

In *Pope*, the victim, who sold sweets and sodas through a window of his residence to those living in his neighborhood, often sold items to the defendant, who the victim described as "a regular customer." *Pope*, 427 S.W.3d at 365. A male companion of the defendant's had recently purchased drinks from the victim, and the victim had served the companion through the window. *Id.* at 366. On the day of the robbery, the defendant and his companion approached the victim's residence, and the victim "invited the two men to enter his residence because he 'felt so comfortable with [the Defendant].'" *Id.* (alteration in original). Once the two men were inside the residence, they attacked the victim and stole merchandise and cash from him. *Id.* At trial, a jury convicted the defendant of aggravated robbery and aggravated burglary, and this court affirmed the convictions. *Id.* at 367. The supreme court reversed the aggravated burglary conviction and dismissed that charge, finding that there was neither a passive nor an affirmative act of deception on the defendant's part:

> As noted, by the language of our statute, failing to correct a false impression of intention, a passive act, does not qualify as deception. Moreover, the State has been unable to produce evidence of an affirmative act by the Defendant – a misstatement of his actual intentions. . . . Although the victim testified that, on the day of the robbery, he had extended the invitation to enter his residence because the Defendant had gained his trust, there was no evidence that the Defendant or his companion had asked to come inside in order to purchase a drink or for any other reason.
>
> . . . .
>
> Under these circumstances, the only conclusion supportable by the evidence is that the victim permitted the Defendant to enter the residence because he recognized and trusted him and offered to extend exceptional hospitality to him. Further, even if the victim could have formed a false impression that the Defendant intended to enter his residence for the purpose of purchasing a drink, our statute does not allow for a conviction based upon the Defendant's failure to correct the victim's false impression of his intention. To hold otherwise would mean that in order to obtain "effective consent" from a property owner, a defendant would have to announce his or her criminal intent prior to obtaining the owner's permission to enter a habitation. Such a construction would "ignore[] the statutory definition of 'effective consent' . . . [and] every felony

-36-

> committed within a building or habitation would also constitute
> a burglary. Our legislature did not intend such a result."

*Id.* at 372-74 (quoting *State v. Michael Flamini*, No. E2008-00418-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, May 26, 2009)) (alteration in *Pope*).

Similar to the facts in *Pope*, no affirmative or passive act of deception occurred in the instant case to negate Mr. Moss's effective consent. Of the witnesses who testified about the defendant's entry into the Moss residence on the evening of December 9, none testified that the defendant affirmatively stated his reason for visiting the house that night before gaining entry. In fact, Ms. Kennedy, who provided the most comprehensive testimony on the subject, stated that the defendant and his companions "just opened" the unlocked glass storm door and walked inside the house without knocking. The defendant had already visited the Moss residence twice earlier in the day looking for Mr. Mansell, and the defendant had entered the house on his second visit to purchase marijuana from Ms. Kennedy. Ms. Kennedy surmised that the defendant simply walked inside on his third visit to the house because he had seen Mr. Mansell's vehicle parked outside and therefore did not need to inquire whether Mr. Mansell was home. In his handwritten statement to law enforcement officers, the defendant stated that he had "knock[ed] on the storm door" and that Mr. Moss "open[ed] up the front door" and permitted the defendant to enter. However, regardless of whether Mr. Moss opened the door and permitted entry to the defendant or the defendant simply walked inside on his own, nothing indicates that the defendant stated the reason for his visit, which would qualify as "a misstatement of his actual intentions." *Pope*, 427 S.W.3d at 372. Although Mr. Tompson testified that the men "entered the house" and "wanted to know where [Mr. Mansell] was," such a statement, if indeed made by the defendant, was made after the defendant had already gained entry to the house, and there was ample testimony that the defendant proceeded to visit Mr. Mansell's room before returning to the living room and opening fire. Therefore, no passive act of deception through a false impression of fact – that the defendant was there to visit Mr. Mansell – occurred. Moreover, "even if the victim could have formed a false impression that the Defendant intended to enter his residence for the purpose of purchasing" marijuana, "our statute does not allow for a conviction based upon the Defendant's failure to correct the victim's false impression of his intention." *Id.* at 374. No act of deception occasioned the defendant's entry into the Moss residence, and, although Mr. Moss did not give his express consent to allow the defendant to enter his residence, the fact that he allowed the defendant to enter is evidence of his apparent consent. *See* T.C.A. § 39-11-106(9).

Because the evidence established that the defendant entered the Moss residence with the consent of Mr. Moss, the evidence was insufficient to support his conviction of aggravated burglary. Accordingly, that conviction is reversed, and the charge is dismissed.

## II. Trial Two

On February 6, 2012, the Rutherford County grand jury issued a superseding indictment, charging the defendant with second degree murder, felony murder in the perpetration of or attempt to perpetrate robbery, felony murder in the perpetration of or attempt to perpetrate a theft, and felony murder in the perpetration of or attempt to perpetrate a burglary.[3] The case proceeded to trial on February 13, 2012.

MPD Sergeant Cary Alan Gensemer was the first to testify, and his testimony was substantially the same as it was in the first trial. Doctor Amy McMaster also testified consistently with her first trial testimony.

Kaitlynn Kennedy testified consistently with her prior testimony. Ms. Kennedy stated that she was shown a photographic lineup while she was in the intensive care unit of the hospital shortly after the shooting, and, although she did not recall making the selection, she recognized her signature on the page where she had circled the defendant's photograph, positively identifying him as the shooter. Ms. Kennedy also positively identified Mr. Heath and Mr. Wilson from a photographic lineup.

Ms. Kennedy knew that both Mr. Moss and Mr. Mansell owned handguns, but she did not see either man use or display a handgun on the evening of December 9, nor did Ms. Kennedy use or display a weapon that night.

Coty Heath testified substantially as he did in the first trial. He added that, when he initially declined to assist in the robbery, the defendant said "he was going to go and see if he could find somebody else, maybe Marcus Johnson. A dude by the name of Marcus Johnson." The defendant returned to Mr. Heath's house later that evening. When Mr. Heath inquired whether the defendant had committed the robbery, the defendant responded that he had not, explaining that "Marcus Johnson didn't want to do it. So, he ain't robbed him yet because he ain't had nobody to rob the man with. Nobody would rob him with him." With respect to the robbery that the defendant planned with Mr. Heath and Mr. Wilson, Mr. Heath testified that "[n]obody was supposed to get killed. Nobody was supposed to get hurt." Mr. Heath explained that "[t]he guns wasn't even supposed to be used. They was just there to scare them so they would give us the weed."

---

[3]The counts corresponding to these four charges differ from the counts in the original trial, but for ease of reference and understanding, we will continue to refer to the counts by their original numbers.

Bobby Wilson[4] also testified consistently with his prior testimony. Mr. Wilson testified that, aside from his handgun and the defendant's handgun, he "never saw a firearm" at the Moss residence on the night of the shooting.

MPD Lieutenant Don Fanning provided testimony that was substantially similar to that offered in the first trial.

Marcus Johnson's testimony from the first trial was read in its entirety into the record. As in the first trial, the State once again introduced into evidence photographs of the incoming text messages Mr. Johnson purportedly received from the defendant as well as photographs of the incoming and outgoing calls between Mr. Johnson and the defendant.

MPD Detective Paul Mongold testified that he had interviewed both Shawn Sherfield and Randall Mansell on more than one occasion and that he was therefore familiar with their voices. Over the defendant's objection, the trial court admitted into evidence the recording of a 9-1-1 call placed on December 9, and Detective Mongold identified the two voices on the call as those of Mr. Sherfield and Mr. Mansell. On the recording, the two men are heard telling the 9-1-1 dispatcher that B.J. Wilson shot their friends.

Detective Mongold otherwise testified consistently with his prior testimony. During his testimony, the trial court admitted into evidence both the video recording of the interview and the defendant's 4-page written statement, reproduced in part earlier in this opinion. In his statement, the defendant claimed, among other things, that both Mr. Moss and Ms. Kennedy pointed guns at him, prompting the defendant to shoot them both. Detective Mongold testified that two handguns were located inside Mr. Moss's residence following the shootings: Mr. Wilson's .22-caliber revolver and Mr. Mansell's .22-caliber semi-automatic. Law enforcement officers did not recover any handguns in, on, or around the living room computer desk or sofa.

On cross-examination, Detective Mongold acknowledged that none of the residents of 1346 Searcy Street indicated that a robbery had occurred on December 9. On redirect examination, Detective Mongold confirmed that, during his December 10, 2008 interview of the defendant, the defendant never mentioned that Mr. Moss or Ms. Kennedy had pointed a handgun at him or that he had been attempting to defend himself.

---

[4]Before testifying in the second trial, Mr. Wilson stated on the record that his name was "Bobby Jewel Wilson. W-I-L-S-O-N." Because Mr. Wilson spelled only his last name for the court reporter, it is not clear whether Mr. Wilson actually gave his middle name as "Jewel" or if the court reporter misinterpreted the name "Joel" as "Jewel." No doubt exists that the witness is the same person identified as the witness "Bobby Joel Wilson" in the first trial.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected not to testify but did choose to put on proof.

Evelyn Alajemba, the defendant's mother, testified that she had previously been employed by Nissan and that, on the first Friday of December 2008, she had received a company buy-out of approximately $89,000 after taxes. Ms. Alajemba testified that she had promised to give the defendant around $2,000 of that money. Ms. Alajemba stated that, to her knowledge, the defendant was not behind in his car payments and that she would have made the payments if he had been.

Based on this evidence, the jury convicted the defendant as charged of second degree murder, felony murder in the perpetration of or attempt to perpetrate a robbery, felony murder in the perpetration of or attempt to perpetrate a theft, and felony murder in the perpetration of or attempt to perpetrate a burglary. The trial court merged the three felony murder convictions and imposed an automatic sentence of life imprisonment with the possibility of parole. Following a sentencing hearing, the trial court sentenced the defendant to 25 years for the second degree murder conviction to be served concurrently with the defendant's life sentence in case number F-67470. The trial court also sentenced the defendant for his convictions in the first trial, imposing the following sentences for case number F-63339A:

| COUNT | CONVICTION (VICTIM) | SENTENCE LENGTH | ALIGNMENT |
|-------|---------------------|-----------------|-----------|
| 1 | Facilitation of Conspiracy to Commit Especially Aggravated Robbery | 6 years | Concurrent with F67470 |
| 2 | Attempted Especially Aggravated Robbery | 12 years | Concurrent with F67470 and F63339A count 1 |
| 5 | Attempted First Degree Murder (Kennedy) | 25 years | Consecutive to F67460 and F63339A counts 1 & 2 |
| 6 | Attempted Voluntary Manslaughter (Tompson) | 4 years | Consecutive to F67470 and F63339A counts 1,2,5,8,9 |
| 7 | Attempted Voluntary Manslaughter (Fogle) | 4 years | Concurrent with F63339A counts 6,10,11 and Consecutive to F67470 and F63339A counts 1,2,5,8,9 |
| 8 | Aggravated Assault (Kennedy) | 6 years | Consecutive to F67470 and F63339A counts 1&2; Merged with count 5 |
| 9 | Aggravated Assault (Kennedy) | 6 years | Consecutive to F67470 and F63339A counts 1&2; Merged with count 5 |

| 10 | Reckless Aggravated Assault (Tompson) | 4 years | Consecutive to F67470 and F63339A counts 1,2,5,8,9; Merged with count 6 |
|----|----|----|----|
| 11 | Reckless Aggravated Assault (Tompson) | 4 years | Consecutive to F67470 and F63339A counts 1,2,5,8,9; Merged with count 6 |
| 12 | Reckless Aggravated Assault (Fogle) | 4 years | Concurrent with F63339A counts 6,10,11; Consecutive to F67470 and F63339A counts 1,2,5,8,9; Merged with count 7 |
| 13 | Reckless Aggravated Assault (Fogle) | 4 years | Concurrent with F63339A counts 6,10,11; Consecutive to F67470 and F63339A counts 1,2,5,8,9; Merged with count 7 |
| 14 | Aggravated Burglary | 6 years | Consecutive to F67470 and F63339A counts 1,2,5,6,7,8,9,10,11,12,13 |

Thus, the trial court imposed a total effective sentence of life plus 35 years.

As pertains to his second trial, the defendant again raises a number of issues. The defendant contends that the trial court erred by finding Marcus Johnson to be unavailable at the second trial; that the evidence adduced at trial was insufficient to support his convictions of felony murder and second degree murder; that the trial court erred in a number of evidentiary rulings; and that the State committed prosecutorial misconduct during closing argument. We consider each claim in turn.

*A. Unavailable Witness*

The defendant first contends that the trial court erred by permitting the State to read into evidence the testimony of Marcus Johnson from the first trial, after finding Mr. Johnson to be unavailable for purposes of Tennessee Rule of Evidence 804.

At trial, Detective Mongold, in a hearing outside the presence of the jury, testified that Mr. Johnson had been a cooperative, willing participant throughout the first trial. Approximately two months prior to the second trial, Detective Mongold contacted Mr. Johnson to notify him that they would need to meet regarding the upcoming trial:

> He stated that he had received some threats. That he was no longer employed at the Wendy's on South Church Street because of the threats. And that he would be in contact with me.

. . . .

> This was over the phone. I asked him to file a report and document this if he did receive the threats. Asked him who the threats were from. He would not give me the names. He says he didn't know. But he would not cooperate with that as in the report. And there is no report that's been filed as far as any kind of threat to me.

That was the last time Detective Mongold spoke with Mr. Johnson. Detective Mongold attempted to serve Mr. Johnson with a subpoena but was unable to locate him. The detective unsuccessfully attempted to contact Mr. Johnson by telephone on six different occasions between January 17 and February 10. On January 26, Detective Mongold spoke with Mr. Johnson's mother, and she advised him that she would instruct her son to contact him. Detective Mongold also spoke with Mr. Johnson's grandmother on February 8, and "she advised she did not know where he was." Detective Mongold left his business card at Mr. Johnson's last known address on three occasions. Four days prior to trial, Detective Mongold issued to the MPD a "BOLO," or "be on the lookout," for Mr. Johnson to no avail. Mr. Johnson was not found at the local jail or workhouse, and Mr. Johnson had not been in contact with his probation officer.

On cross-examination, Detective Mongold confirmed that he had attempted to reach Mr. Johnson on "every phone [number] affiliated with him that I have in my possession." Detective Mongold visited Mr. Johnson's sister on Searcy Street on January 26, but "they would not answer the door."

The trial court ruled that Mr. Johnson's prior testimony was admissible, finding as follows:

> Based on the testimony I have heard, the motion of the State, and a review of the record, which reflects that a proper subpoena was issued, the testimony of Detective Mongold concerning efforts made on behalf of the State to have Mr. Johnson here, the [c]ourt finds that the State has made reasonable efforts to secure Mr. Johnson's presence.

> And further that the testimony which he gave at – his prior testimony which he gave at trial was given at a time when the [d]efendant had the opportunity to cross examine and develop his testimony. And was under a similar motivation or

-42-

had the same motive or motivation to cross examine him at that trial as it would at this trial, the [c]ourt would grant the State's motion to have his prior testimony admitted at trial if he's not found before such time as the State plans to call him as a witness in their case in chief.

As the defendant correctly argues, admission of former testimony is governed by Tennessee Rule of Evidence 804, which provides a hearsay exception for the former testimony of a declarant who is unavailable as a witness if the testimony was "given as a witness at another hearing of the same or a different proceeding . . ., if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). Before such testimony will be admitted, however, the proponent must establish that the witness "is absent from the hearing and the proponent of [the] statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5). Further, in cases similar to the instant case in which the prosecution seeks to offer the former testimony of an unavailable witness, the State must establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. First, the State must show that the declarant is truly unavailable after good faith efforts to obtain his presence, and, second, that the evidence carries its own indicia of reliability. *State v. Arnold*, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (stating the rule of *Ohio v. Roberts*, 448 U.S. 56, 100 (1980), *overruled by Crawford v. Washington*, 541 U.S. 36 (2004)). With respect to good faith efforts, "[t]he ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Roberts*, 448 U.S. at 74. With respect to the latter requirement, our Supreme Court has stated that reliability of a prior testimonial statement is shown exclusively via cross-examination. *Crawford*, 541 U.S. at 61.

In the instant case, the defendant argues that Mr. Johnson was not unavailable as that term is contemplated in Rule 804 because he was never subpoenaed. First, we reject the defendant's claim that Mr. Johnson was not an unavailable witness. Although the State was unsuccessful in its efforts to serve Mr. Johnson with a subpoena, it is clear that Mr. Johnson was aware of the proceedings, expressed concern over threats he had allegedly received, and took measures to prevent the State from discovering his whereabouts. The State presented ample evidence of Detective Mongold's multiple good faith efforts to locate Mr. Johnson. Given these facts in support of the State's good faith efforts, the failure to effectively serve Mr. Johnson with a subpoena is irrelevant. *See State v. Summers*, 159 S.W.3d 586, 596-98 (Tenn. Crim. App. 2004) (finding lack of actual service of subpoena "irrelevant" where State made good faith efforts to locate witness and witness took affirmative action to absent himself from proceedings).

Second, the evidence presented demonstrates that Mr. Johnson's testimony was reliable. The defendant had an identical motive and opportunity in the first trial to develop Mr. Johnson's testimony through cross-examination, given that the defendant was facing the same felony murder charges in the first trial that he was in the second trial.

Given these circumstances, we hold that the trial court did not err by admitting Mr. Johnson's prior testimony based upon his unavailability to the State at the time of trial.

*B. Sufficiency*

The defendant next contends that the evidence is insufficient to support his convictions of felony murder in the perpetration of or attempt to perpetrate robbery, burglary, and theft. He claims that the evidence of these crimes consisted primarily of uncorroborated accomplice testimony and that the State failed to establish that the murder of Mr. Moss occurred in the perpetration of any underlying felony.

Because, as we held earlier in this opinion, the evidence in the first trial was insufficient to support the defendant's conviction of aggravated burglary, the evidence pertaining to the charge of felony murder in the perpetration of a burglary was likewise insufficient, and that charge should have been dismissed at the conclusion of the first trial. Accordingly, for the same reasons stated in our discussion of the sufficiency of the evidence supporting the aggravated burglary conviction, the defendant's conviction of felony murder in the perpetration of or attempt to perpetrate a burglary is reversed, and the charge is dismissed. We will, however, examine the sufficiency of the evidence as pertains to the convictions of felony murder in the perpetration of robbery and theft.

Again, we review claims of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State

-44-

the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

As charged in this case, felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . [or] theft." T.C.A. § 39-13-202(a)(2). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

It is well established that before a killing will "fall within the definition of felony murder, [it] must have been 'done in pursuance of the unlawful act, and not collateral to it.'" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (1956))). "In other words, 'The killing must have had an intimate relation and close connection with the felony . . . , and not be separate, distinct, and independent from it[.]'" *Farmer*, 296 S.W.2d at 883 (quoting *Wharton on Homicide*, § 126 (3rd ed.)); *see also, e.g., Banks*, 271 S.W.3d at 140;

*State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005). To satisfy the requirement of "an intimate relation and close connection," "the killing 'may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action.'" *Thacker*, 164 S.W.3d at 223 (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)). Moreover, "there should be a causal connection between the killing and the felony." *Buggs*, 995 S.W.3d at 106 (citing *Farmer*, 296 S.W.2d at 884; *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988)). Requiring a causal connection between the homicide and the underlying felony promotes the deterrent effect of the rule by precluding a first degree murder conviction for "killings which are collateral to and separate from the underlying felony." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). "Moreover, requiring a close nexus between the [underlying felony] and the killing is particularly appropriate given that the felony murder rule is 'a legal fiction in which the intent and the malice to commit the underlying felony is 'transferred' to elevate an unintentional killing to first-degree murder.'" *Id.* (quoting *Buggs*, 995 S.W.2d at 107).

A killing will be considered to have been committed "in the perpetration of" the underlying felony "where the homicide is so closely connected with the underlying felony as to be within the *res gestae* thereof, or where the homicide is so linked to the felony as to form one continuous transaction." *Buggs*, 995 S.W.3d at 106 (citing 40 Am. Jur. 2d *Homicide* § 67 (1999)). "The *res gestae* embraces not only the actual facts of the transaction and the circumstances surrounding it, but also the matters immediately antecedent to the transaction and having a direct causal connection with it, as well as acts immediately following it and so closely connected as to form in reality a part of the occurrence." *State v. Patrick Wingate*, No. M1999-00624-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, May 25, 2000) (citing *Payne v. State*, 406 P.2d 922, 925 (Nev. 1965)).

In the instant case, the proof at trial established that the defendant went to Mr. Heath's house on the morning of December 9, 2008, and invited Mr. Heath to join him in robbing Mr. Moss of his marijuana and cash. When Mr. Heath declined, the defendant stated that he was going to approach Mr. Johnson with the same offer. The defendant then located Mr. Johnson and asked him to participate in a robbery with him, showing Mr. Johnson his .357 revolver. Mr. Johnson also declined. Later that day, the defendant returned to Mr. Heath's house, and the two men discussed the potential robbery. Mr. Heath contacted Mr. Wilson, and Mr. Wilson agreed to meet the defendant and Mr. Heath to discuss the robbery; Mr. Wilson also brought along his own handgun at the request of Mr. Heath. The three men met at McDonald's, and as Mr. Wilson drove the trio to Mr. Moss's residence, they discussed the plan: the defendant would "pull the gun" on Mr. Moss, Mr. Wilson would "pull the gun on whoever else was there," and Mr. Heath would steal "the weed or whatever." The defendant directed Mr. Wilson to park his car facing the street and to leave the motor running so that they could make a quick getaway. At the defendant's request, Mr. Wilson provided

him with a $20 bill to show Mr. Moss to "get them to pull the weed out or whatever." While Ms. Kennedy was putting together a bag of marijuana for the defendant, Mr. Heath saw the defendant give him the "thumbs up" signal, and then "gunshots just started going off." Mr. Heath and Ms. Kennedy testified that the defendant shot Mr. Moss multiple times. Doctor McMaster testified that the cause of Mr. Moss's death was multiple gunshot wounds, and the manner of death was homicide. Mr. Heath testified that he grabbed the bag of marijuana from the living room table before fleeing from the house. When the defendant spoke with Mr. Johnson following the shooting, he told Mr. Johnson that "it was a robbery gone wrong."

Taking all of this evidence into consideration, we find the evidence supports the defendant's convictions of felony murder in the perpetration of or attempt to perpetrate both robbery and theft. The defendant clearly intended to rob Mr. Moss of drugs and money by using his handgun to put Mr. Moss "in fear." *See* T.C.A. § 39-13-401(a). The defendant entered Mr. Moss's residence with the intent to commit a robbery. *See id.* § 39-14-402(a)(1). The defendant attempted to steal drugs from Mr. Moss without Mr. Moss's "effective consent." *See id.* § 39-14-103. The murder of Mr. Moss was accomplished "in pursuance of" these unlawful acts. *Banks*, 271 S.W.3d at 140. The testimony of Mr. Johnson that the defendant asked him to commit a robbery on the morning of December 9 and that, later that same night following the shooting, the defendant admitted to him that the incident on Searcy Street was "a robbery gone wrong" was enough to corroborate the testimony of Mr. Heath and Mr. Wilson and "connect the defendant with the commission of the crime[s] charged." *Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803). Viewing this evidence in the light most favorable to the prosecution, we find the evidence adduced at trial sufficiently established the defendant's convictions of felony murder in the perpetration of or attempt to perpetrate both robbery and theft.

## C.  Evidentiary Issues

The defendant raises a number of issues related to the admission of evidence at trial, complaining that the State should have been precluded from introducing evidence that the defendant shot Ms. Kennedy and disposed of his gun; that the State should not have been permitted to introduce evidence that Mr. Sherfield and Mr. Mansell contacted 9-1-1 because neither man was called as a witness; that the defendant should have been permitted to question Doctor McMaster about blood test results indicating that Mr. Moss had used marijuana; that the defendant should have been allowed to question Ms. Kennedy about whether other people had attempted to purchase marijuana from her on December 9, 2008; that the defendant should have been permitted to question Mr. Heath regarding a statement he made in the first trial that he was likely facing "51 years to life" in prison; and that the defendant should have been allowed to question Detective Mongold about "the checkered past" of Mr. Moss. We will briefly address each of these issues in turn.

### 1. Shooting of Ms. Kennedy and Disposal of Handgun

We disagree with the defendant's contention that the shooting of Ms. Kennedy was irrelevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The fact that the defendant shot Ms. Kennedy serves to explain the State's theory of theft because Ms. Kennedy possessed the marijuana that Mr. Heath stole. Similarly, the defendant's disposal of the handgun was relevant to prove that the defendant was the shooter.

### 2. 9-1-1 Call

The defendant contends that the trial court erred by permitting the State to introduce the audio recording of the 9-1-1 call from Mr. Sherfield and Mr. Mansell because the statements on the recording were inadmissible hearsay. We disagree. In his testimony, Detective Mongold identified the callers on the 9-1-1 recording as Mr. Sherfield and Mr. Mansell. The statements made by Mr. Sherfield and Mr. Mansell did not constitute hearsay because they were not offered to prove the truth of their content. *See* Tenn. R. Evid. 801(c). Even if, however, the trial court erred by admitting the recording, any error from the admission of these statements was harmless.

### 3. Testimony of Doctor McMaster

The defendant argues that the trial court erred by both refusing to allow the defendant to question Doctor McMaster about the blood test results that indicated that Mr. Moss had used marijuana and by permitting Doctor McMaster to testify that Mr. Moss could possibly have run from the house after sustaining gunshot wounds to his chest and back. With respect to the defendant's first claim, Mr. Moss's use of marijuana was irrelevant. *See* Tenn. R. Evid. 401, 402. With respect to the defendant's second claim, Mr. Moss's potential ability to run a short distance following his shooting was indeed relevant and was not unfairly prejudicial. *See* Tenn. R. Evid. 403.

### 4. Testimony of Marijuana Sales

The defendant next contends that the trial court erred by precluding the defendant from questioning Ms. Kennedy "regarding other people coming to the house on the date in question to buy marijuana when she had testified that the reason Tommy Moss was shot was because she told the [d]efendant they did not sell marijuana." Even if such testimony was relevant and the trial court erred by excluding it, any error occasioned by its omission was harmless in light of the overwhelming evidence of the defendant's guilt.

### 5. *Statement of Mr. Heath regarding Jail Time*

The defendant asserts that the trial court erred by precluding him from questioning Mr. Heath concerning a prior testimonial statement made regarding potential jail time. The defendant cited no authority in his brief to support this argument. For that reason, he has waived our consideration of this issue. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### 6. *"Checkered Past" of Mr. Moss*

The defendant contends that the trial court erred by refusing to allow him to question Detective Mongold about the alleged "checkered past" of Mr. Moss. In support of this contention, the defendant makes only conclusory statements and cursory citations to the rules of evidentiary relevance. For this reason, the defendant has once again waived our consideration of this issue for failure to cite to *adequate* authority and to present an *adequate* argument. *See* Tenn. Ct. Crim. App. R. 10(b).

### D. *Prosecutorial Misconduct*

Finally, the defendant contends that the prosecutor committed misconduct during closing argument by "assert[ing] . . . his own character to support and augment the character of the accomplices, Coty Heath and Bobby Wilson." The State responds that the prosecutor was merely "defending his integrity before the jury" rather than "vouching for the credibility of the witnesses."

During closing argument, the defense attorney reminded the jurors that he had asked them to pay attention to the demeanor of the witnesses:

> You heard Coty Heath testify. You heard him say, yes, I'm a liar. Yeah, I lied. And I lied to try to get out of this. But now I just want to do the right thing.
>
> And it's just coincidental when he decides to do what he defines as the right thing, he walks out of jail three weeks later. It's coincidence, I'm sure.

. . . .

The bottom line here is – and do you remember the other day I told you about lying liars. Do you remember? Lying liars. That's what we have here. We have a host of folks that don't know what the truth is.

They only know what the truth is apparently when they can get something for it. That's what we have in this situation. Lying liars and the lies they tell.

In rebuttal, the State's attorney addressed the statements made by Mr. Heath to law enforcement officers following his arrest, acknowledging that Mr. Heath had initially lied to officers. The prosecutor then continued as follows:

And as time [goes] on, Coty Heath, for whatever reason, whether it be talking with his attorney or whether it be something that come into his mind, I don't know. I can't tell you. But he gave another statement to Detective Mongold.

I can tell you he did not give a statement to Detective Mongold in consideration of some kind of offer. I can tell you that for prosecuting for 10 years, I am not going to throw away my career, my livelihood, my liberty and suborn perjury and say, you need to say this. You need to lie about me making you this offer. And you need to go in there and tell this group of people so I can hammer [the defendant]. Yeah, me. Let me go to jail. No, thank you.

On that second occasion he lied to the police again. And he told you why. I didn't want to get in trouble. I didn't want to incriminate myself. I had to tell them something. I believe I needed to let them know something. There is no way I'm not involved in it because I have been identified.

There is a McDonald's video showing me with them. They are going to have to know something. So, he lies. He lies to keep himself out of trouble. He lies because if he told them the truth he would be admitting that he is involved in a robbery and the felony murder of Tommy Moss. So, he lies.

-50-

And I submit to you as time goes on, Mr. Heath figured out they know I'm lying. They know I'm lying. I'm a juvenile. I'm in juvenile court. What's going to happen to me. I have lied and I have lied and I have lied. And there's no hope for me.

Tell the truth. Tell the truth. You have to admit what's happened. . . .

. . . .

And he was given an opportunity to do that. And he came in and he testified under oath. And then you heard his testimony the other day.

And you will go back and you will make a determination. A determination as to whether or not Coty Heath made a conscious decision to say, well, I'm going to come. And under oath I'm going to testify and I'm going to give these statements.

By the way, as the [d]efense keeps cross examining, I'm going to commit aggravated perjury. I'm going to show that the D.A. is suborning perjury because he gave me this great deal and I knew about it in advance.

That's what the [d]efense says they want you to reasonably believe that the State of Tennessee, specifically me, is going to go out –

At that point, defense counsel objected, stating that there was "no proof in the record of such a thing." The prosecutor agreed but stated that he was merely responding to an argument defense counsel had made. The trial court overruled the objection, finding that the prosecutor's statement was not inappropriate but asking counsel "to restrict the argument to facts in the record and legitimate argument." The prosecutor then continued his argument:

Coty Heath was questioned time and time again. Isn't it true you are not testifying up here for nothing. You want this jury to believe you didn't know when you gave that statement under oath what was going to happen to you.

That when you testified under oath in July [2011] you

-51-

had no clue, you had no offers. Well, he only talked to one person from the State. And that was me. So, either Coty Heath was telling the truth that he didn't have any or he committed aggravated perjury when he told you that when I made that statement under oath I didn't have any offers. And by the very nature of it, they are saying I suborned perjury.

Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130-131 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 131. We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *Id.* (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *Hill*, 333 S.W.2d at 131 (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). An appellate court considering the propriety of closing argument examines the following factors:

(1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
(2) [t]he curative measures undertaken by the court and the prosecution[;]
(3) [t]he intent of the prosecutor in making the improper statements[;]
(4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
(5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Applying these factors to the instant case, we note that, in viewing the conduct of the prosecutor in the context of the closing arguments, defense counsel intimated in his closing argument that favorable plea offers from the State caused Mr. Heath to change his statement, and the prosecutor was merely responding to those thinly-veiled accusations in his rebuttal argument. With respect to curative measures, the trial court overruled the defendant's objection, finding that the prosecutor's argument was not inappropriate, but the court did instruct the prosecutor to "restrict the argument to facts in the record and legitimate

argument." The prosecutor did briefly continue his argument along those lines, suggesting that to believe Mr. Heath was induced to lie would indicate that the prosecutor had "suborned perjury." The third factor, that of the prosecutor's intent, weighs in favor of the State. We discern no malice in the prosecutor's statements. Rather, he was merely responding to defense counsel's argument. The cumulative effect of the conduct was fleeting. Finally, when viewing the prosecutor's conduct in rebuttal argument against the strength of the case, we conclude that the evidence against the defendant was extremely strong and that the issue forming the basis of the defendant's complaint was not a central part of the defense.

Taking all of these factors together, we hold that the argument, if improper, did not likely affect the outcome of the trial. Accordingly, any error was harmless.

### III. Conclusion

The trial court did not abuse its discretion by finding that the defendant suffered no speedy trial violation. The trial court properly denied both the defendant's motion to suppress his statement to Detective Mongold and his motion for transcription of witness statements. The evidence is sufficient to support the defendant's convictions of felony murder in the perpetration of or attempt to perpetrate both robbery and theft, facilitation of conspiracy to commit especially aggravated robbery, and attempted especially aggravated robbery. The evidence is insufficient to support the defendant's convictions of aggravated burglary and felony murder in the perpetration of or attempt to perpetrate burglary. Neither the cursory evidentiary issues raised by the defendant nor the prosecutor's statements during closing argument amount to reversible error. Accordingly, we reverse the convictions of aggravated burglary and felony murder in the perpetration of or attempt to perpetrate burglary, and those charges are dismissed. In all other respects, we affirm the judgment of the trial court. The resulting effective sentence is life plus 29 years.

_____
JAMES CURWOOD WITT, JR., JUDGE